**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| AUSTIN SKAGGS, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>X.AI, LLC,<br><br>　　　　　Defendant. | Case No.  26-cv-04550-BLF<br><br><br>**ORDER DENYING MOTION TO TRANSFER**<br><br>[Re:  ECF No. 21] |

Before the Court is Defendant X.AI LLC's motion to transfer pursuant to 28 U.S.C. § 1404(a). ECF No. 21 ("Mot."); ECF No. 24 ("Reply").  Plaintiff Austin Skaggs opposes the motion. ECF No. 22 ("Opp.").

The Court previously determined that the motion is suitable for disposition without oral argument and vacated the hearing.  ECF No. 27; *see* Civ. L.R. 7-1(b).  The motion to transfer is DENIED for the reasons discussed below.

## I.    BACKGROUND

On May 14, 2026, Plaintiff brought this putative class action challenging Defendant's practices in connection with its AI chatbot service, Grok.  ECF No. 1 ("Compl.").  Plaintiff brought this action on behalf of himself and "all United States residents who have accessed and entered queries into Grok.com[.]" *Id.* ¶ 1.  Plaintiff alleges that Defendant "disclosed private and confidential information" to third parties in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, et seq., the California Invasion of Privacy Act, Cal. Penal Code §§ 630-38, the California Constitution, and California common law.  *Id.* ¶¶ 99–149.

On May 21, 2026, Defendant moved to transfer this action to the Northern District of Texas based on two forum selection clauses in two versions of Defendant's terms of service. *See* 28 U.S.C. § 1404(a). Plaintiff opposes the motion based on his assertion that he was neither on notice of nor assented to those terms.

## II.    LEGAL STANDARD

A district court may, in the interest of justice, transfer a case "[f]or the convenience of parties and witnesses" to "any other district or division where it might have been brought." 28 U.S.C. § 1404(a). An action "might have been brought" in any court that has subject matter jurisdiction over the claims and personal jurisdiction over the defendant, and where venue would have been proper. *See Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1040 (N.D. Cal. 2020).

In the absence of a forum selection clause, courts may consider several factors in determining whether transfer under section 1404(a) is appropriate. *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 (9th Cir. 2000) (reciting factors). However, if parties agreed to a forum selection clause, a court should afford that clause "controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (quoting *Stewart Org. v. Ricoh Corp.,* 487 U.S. 22, 33 (1988)).

When parties do not dispute the applicability or the enforceability of a forum selection clause, the disposition of a transfer motion hinges on whether the parties agreed to the forum selection clause through a valid contract. *See Atl. Marine*, 571 U.S. at 63. "[F]ederal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). California law governs the issue of contract formation here, where Plaintiff is a California resident and his allegations stem from his experience using Grok in California. *See Castro v. JPMorgan Chase Bank, N.A.*, No. 14-cv-01539 NC, 2014 WL 2959509, at *2 (N.D. Cal. June 30, 2014) ("The law of the place where a contract was made determines questions related to its validity."); *see also Topolewski v. Experian Data Corp.*, 736 F. Supp. 3d 818, 824 (C.D. Cal. 2024) (applying California law to determine the validity of a sign-in wrap agreement entered into by California resident).

United States District Court
Northern District of California

### III.  DISCUSSION

Defendant's motion to transfer this case to the Northern District of Texas is predicated on two similar forum selection clauses in the 2025 and 2026 versions of Defendant's terms of service, respectively.  Mot. at 5.  Defendant argues that Plaintiff first agreed to the 2025 forum selection clause when he signed up for a Grok account in September of that year.  *Id.*  Defendant also contends that Plaintiff agreed to that same clause again when he "visited [Grok] and entered queries" in 2025.  *Id.*  The provision states in relevant part:

> [A]ll claims or disputes between You and xAI shall be governed by the laws of Texas without regard to conflict of law principles, and *shall be brought exclusively in the state and federal courts in Tarrant County, Texas*, and the parties hereby irrevocably consent to the exclusive jurisdiction and venue of such courts.

*See* ECF No. 21-2 ("Murphy Decl."), Ex. B at 5 ("2025 Terms") (emphasis added).

At some point between September 2025 and May 2026 (when Plaintiff brought this action), Defendant updated its terms and conditions.  *See* Murphy Decl. ¶ 9.  Defendant contends that Plaintiff also agreed to the new version, effective April 10, 2026, by "'visiting [Grok] and enter[ing] queries' . . . as recently as May 2026."  *See id.*; Mot. at 5 (quoting Compl. ¶ 7).  The 2026 provision states in relevant part:

> [A]ll disputes related to these Terms, the Service, or any patents – including without limitation disputes related to or arising from any Content (whether your or others' Content), or your or others' use of the Service or the complete or partial termination thereof – shall be brought and *must proceed exclusively in the federal U.S. District Court for the Northern District of Texas or state courts located in Wichita County or Tarrant County, Texas, United States*, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum.

*See* Murphy Decl., Ex. A at 5 ("2026 Terms") (emphasis added).

Plaintiff does not dispute that the two forum selection clauses would control if he had agreed to them.  However, he contends that he was not on notice of and thus did not assent to either version of Defendant's terms of service.  Accordingly, the disposition of this motion turns on the issue of contract formation.

#### A.  Internet Contract Formation Under California Law

Under California law, contract formation requires "actual or constructive notice of the

3

agreement" and that "the parties . . . manifest mutual assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023) (quoting *Berman,* 30 F.4th at 855). These elemental requirements apply with full force to Internet contracts between a website—usually through its terms and conditions—and users who engage it. *See Berman,* 30 F.4th at 857. Even if a user lacks actual notice of the website's terms, he may nonetheless be bound under the "inquiry theory" of contract formation so long as "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests [his] assent to those terms." *Berman*, 30 F.4th at 856 (applying California law). In determining whether notice is reasonably conspicuous, courts must consider both "the context of the transaction" as well as the "traditional inquiry related to the visuals involved with the notice, such as font size, text placement, and overall screen design." *See Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (quoting *Keebaugh v. Warner Bros. Ent. Inc*., 100 F.4th 1005, 1019 (9th Cir. 2024)).

Internet contracts come in several flavors, and this test applies to all of them. *See id.* (noting that a sign-in wrap agreement, "like all online contracts," may be enforceable based on inquiry notice). However, because each type of agreement requires a user to "manifest assent" in a different way, courts enforce them to varying degrees. On one end of the continuum are browsewrap agreements, which purport to bind a user to the website's terms by virtue of the user browsing the site. "Courts have consistently held this type of agreement to be unenforceable[.]" *Keebaugh*, 100 F.4th at 1014 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014)). At the other end of the continuum are clickwrap agreements (in which a user accepts terms by clicking a box stating that he agrees) and scrollwrap agreements (in which a user must first scroll to the end of the terms before he can click a box affirming his assent). *See Chabolla,* 129 F.4th at 1154 (first citing *Oberstein*, 60 F.4th at 513, then citing *Keebaugh*, 100 F.4th at 1014). Courts routinely enforce both clickwrap and scrollwrap agreements. *Id.* Falling somewhere in the middle are sign-in wrap agreements, in which "the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Id.*

4

United States District Court
Northern District of California

**B. The Sign-Up Screen and the Chat Screen in This Case**

Defendant argues that Plaintiff agreed to the 2025 Terms when he signed up for a Grok account in September 2025. *See* Mot. at 5; Murphy Decl. ¶ 26 ("sign-up screen"). Defendant also contends that Plaintiff re-agreed to the 2025 Terms and the 2026 Terms by "'visiting [the Grok chat screen] and entering queries' since 2025 . . . and as recently as May 2026." *See* Mot. at 5 (quoting Compl. ¶ 7); Murphy Decl. ¶ 28 ("chat screen"). Defendant characterizes the sign-up screen as a sign-in wrap agreement, Mot. at 4 n.1, which Plaintiff does not dispute. As to the chat screen, Defendant does not classify it as a particular type of Internet agreement. Plaintiff contends that the chat screen should be treated as a browsewrap agreement. Opp. at 5.

### 1. The Sign-Up Screen

 

Mobile Version                      Desktop Version

*See* Murphy Decl. ¶ 26

On both the mobile and desktop versions of the sign-up page, the background is black. Defendant's logo appears in white in the top left corner. In the right corner is a faint gray line surrounding a drop-down arrow and text that says, "You are signing into Grok." Toward the top of the screen is relatively large white text that reads "Create your account." Below that are four

oval buttons stacked vertically, each offering a different method to sign up.  All four buttons use the same size text, smaller than the large white text above it.  The top button is white with "Sign up with X" in black text.  A thin, faint, gray line separates that button from the other three buttons.  Those three buttons are black with white text, reading "Sign up with email," "Sign up with Apple," and "Sign up with Google," respectively.  Each button contains a small logo next to the text.  The logo for X is in black; the logos for email and Apple are in white.  The logo for Google is multi-colored.  Immediately below the Google button is smaller text that reads "Already have an account? Sign in."  That text is light gray, except for "Sign in," which is white.

Below that line of text is empty space.  At the bottom of the screen is gray text that reads: "By continuing, you agree to xAI's Terms of Service and Privacy Policy."  Both "Terms of Service" and "Privacy Policy" are in white, underlined, and contain a hyperlink to the respective documents.  Because the website "provides a link to the terms of use and indicates that some action," here continuing to sign-up for Grok, "binds the user but does not require that the user actually review the terms," the Court agrees with Defendant that this page most resembles a sign-in wrap agreement.  *See Chabolla,* 129 F.4th at 1154; Mot. at 4.

United States District Court
Northern District of California

6

United States District Court
Northern District of California

### 2. The Chat Screen



*See* Murphy Decl. ¶ 28.

The background of the chat screen is black. Centered in the top third of the screen is "Grok" and its logo in relatively large white text. Right beneath that—still in the top third of the screen—is a dark gray query box with "What do you want to know?" in light gray font. The box also includes a few words and symbols, including a plus sign, the word "Fast" with a dropdown arrow, a microphone, and a white circle icon containing black vertical lines. Those features are in white or light gray. Beneath the query box is empty space. At the very bottom of the screen is one sentence that reads "By messaging Grok, you agree to our Terms and Privacy Policy." Both "Terms" and "Privacy Policy" are in white; the rest of the text is in light gray.

Plaintiff describes this screen as a "prototypical browsewrap" agreement because a user "gives his assent simply by using the website." Opp. at 6 (quoting *Nguyen,* 763 F.3d at 1176). The Court disagrees with this characterization because a "prototypical" browsewrap agreement purports to bind a user as soon as he visits a website, which he necessarily must do before he can

7

locate or read any governing terms. *See Nguyen,* 763 F.3d at 1176. Here, the chat screen notice says: "By *messaging Grok*, you agree to our Terms and Privacy Policy." Murphy Decl. ¶ 28 (emphasis added). Under the plain English reading of this sentence, a user who visits the chat screen but does not message Grok has not agreed to Defendant's terms. Thus, the Court finds that the chat screen also "most closely resembles a sign-in wrap agreement" because, although it provides a link to the terms, it "does not require that the user actually read them before moving on." *Chabolla,* 129 F.4th at 1154.

### C. Analysis

Having determined that both screens are properly characterized as sign-in wrap agreements, the Court must next determine whether Plaintiff assented to the 2025 Terms or the 2026 Terms containing the forum selection clauses at issue. As discussed above, the answer to that question turns on whether Plaintiff received reasonably conspicuous notice of and unambiguously manifested his assent to the terms on the sign-up screen or the chat screen. *See Berman,* 30 F.4th at 856.

In determining whether notice is reasonably conspicuous, courts must consider both "the context of the transaction" as well as the "traditional inquiry related to the visuals involved with the notice, such as font size, text placement, and overall screen design." *See Chabolla,* 129 F.4th at 1154 (quoting *Keebaugh*, 100 F.4th at 1019). The reasonable notice inquiry "has always been context-and fact-specific." *Oberstein,* 60 F.4th at 515 (citation and internal quotation marks omitted). "[C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Nguyen*, 763 F.3d at 1179.

#### 1. Transactional Context

The Court turns first to the transactional context, which bears on the diligence expected of the user. This factor is "important . . . to consider and is key to determining the expectations of a typical consumer." *Keebaugh,* 100 F.4th at 1019 (citing *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 947 (2022)). Yet the Parties devote little space to addressing the transactional context at play here. Defendant offers one sentence in a footnote in its reply brief, citing to *Oberstein* and contending that "signing up for an account is the type of transaction that contemplates an ongoing

8

relationship." Reply at 4. Plaintiff does not discuss this issue.

Users who contemplate "some sort of continuing relationship" with the website should anticipate that this relationship is "bound by terms, even if not explicitly told." *See Chabolla,* 129 F.4th at 1154 (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 447 (2021)). On the other hand, a user who intends for his interaction with a website to be a one-off occurrence is "unlikely to be on the lookout for fine print." *Berman*, 30 F.4th at 869 (Baker, J., concurring). "[A] consumer that does not expect to be bound by contractual terms is less likely to be looking for them." *Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1097 (C.D. Cal. 2023) (quoting *Sellers*, 73 Cal. App. 5th at 476). Transactions that do *not* favor reasonable notice include "buying two tablet devices, purchasing a single flower arrangement, or signing up for a $5 trial." *Keebaugh,* 100 F.4th at 1020 (citations omitted) (first citing *Nguyen*, 763 F.3d at 1173; then citing *Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 858 (2016); and then citing *Sellers*, 73 Cal. App. 5th at 454). The same is true when a "one-time purchase of a product . . . triggers an 'automatically recurring membership[].'" *Godun v. JustAnswer LLC*, 135 F.4th 699, 712 (9th Cir. 2025) (quoting *Sellers*, 73 Cal. App. 5th at 480).

Transactions that *do* favor reasonable notice include downloading a mobile game app with in-app purchases, making an account with a ticket purchasing website through a "full registration process," and creating an account and sharing biometric information with a dating service. *See Keebaugh,* 100 F.4th at 1020 (mobile game app); *Oberstein,* 60 F.4th at 517 (ticket purchasing website); *Massel v. Successfulmatch.com*, No. 24-1870, 2025 WL 2452371, at *1 (9th Cir. Aug. 26, 2025) (dating service). Somewhere in between is the transaction in *Chabolla,* where a user purchased a one-month subscription to a service providing access to gyms and fitness studios. *See* 129 F.4th at 1151–52. Because there were conflicting indicia and because "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers," the *Chabolla* court found that the transactional context factor "neither weighs in favor of nor against the notice requirement." *See id.* at 1156 (internal quotation marks omitted) (quoting *Sellers*, 73 Cal. App. 5th at 480).

On balance, two details persuade the Court that the transactional context here favors

reasonable notice.  The Court's finding is based on more than just the mere fact that Plaintiff "sign[ed] up for an account [on Grok]," as Defendant urges.  Reply at 4.  The first factor is that, although an account is "not required" to use Grok, Plaintiff chose to make one anyway.  *See* Mot. at 3; Murphy Decl. ¶ 13.  The second is that, after making that account, Plaintiff used Grok repeatedly "throughout 2025 and 2026" to "enter[] queries related to sensitive information about finances, investment strategy, private health conditions, business projects, and other private information."  Compl. ¶ 7.  In the Court's view, a user who affirmatively chooses to make an account when doing so is optional and recurrently uses the corresponding web service should reasonably contemplate "some sort of continuing relationship" accompanied by terms and conditions.  *Oberstein,* 60 F.4th at 517 (quoting *Sellers*, 73 Cal. App. 5th at 480).  That Plaintiff used Grok to discuss sensitive personal information also weighs in favor of the notice requirement.  *Cf. Massel,* 2025 WL 2452371, at *1 (finding that a reasonable user who "shared his biometric information with [a] dating service" would be "more vigilant in looking for contractual terms" (quoting *Godun,* 135 F.4th at 709)).

### 2.  Visual Aspects of the Notice

The second part of the reasonable conspicuousness test is the visual analysis.  In this respect, Plaintiff contends that both the sign-up screen and the chat screen notices are insufficient; Defendant maintains that both are adequate.  *See* Opp. at 2–4, 6–7; Reply at 1–2.  The crux of the visual analysis is whether the contractual terms are displayed such that "the court can fairly assume that a reasonably prudent Internet user would have seen [them]."  *Berman,* 30 F.4th at 856.  Details including the location of the terms relative to other webpage elements and the font size, color, contrast, and formatting inform whether the advisal is reasonably conspicuous in the context of the website's overall design.  *See Chabolla*, 129 F.4th at 1157.

Importantly, as this analysis is necessarily fact-intensive, there is no "checklist for website designers," nor are there "per se design rules that must be followed."  *Godun,* 135 F.4th at 710. "[E]ven minor differences in the design elements" can be dispositive, and "any suggestion that hard-and-fast rules constrain this inquiry" is erroneous.  *Id.* (internal quotation marks omitted) (quoting *Sellers*, 73 Cal. App. 5th at 481).  At bottom, "[w]ebsite users are entitled to assume that

10

important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Lanzarin v. Topps Co., Inc.*, No. 26-cv-00063-RS, 2026 WL 1865744, at *4 (N.D. Cal. June 29, 2026) (quoting *Berman,* 30 F.4th at 857).

### a.  The Sign-Up Screen

With respect to the sign-up screen, Plaintiff contends that the terms are inconspicuous because of the placement and font.[1]  Plaintiff relies primarily on *Chabolla* to support the proposition that the hyperlink's location "deprives it of conspicuousness." *See* Opp. at 4.  In that case, the user was confronted with a box to type her email address and a "Continue" button right below it.  *See Chabolla*, 129 F.4th at 1157.  Underneath that button was the word "or" followed by another button that said "Sign up with Facebook." *Id.*  The notice of terms was found *below* the Facebook button, "on the periphery of where a user intending to use their email would be looking." *Id.*  Because "[a] reasonably prudent user would likely click 'Continue' and read no further if she had no intention of using Facebook," the notice was "outside of the user's natural flow." *Id.*

Plaintiff's reliance on *Chabolla* is persuasive.  In applying *Chabolla* here, Plaintiff reasons that the terms are "well below each of the buttons a user may click on," and a user who "clicked 'Sign up with X' would not read the subsequent button options, as those options do not pertain to the user." Opp. at 3.  Defendant's only counterargument is that the notice is not "outside of the user's natural flow" because it is "a prominent banner" positioned "directly beneath every sign-up button." Reply at 1, 2.  This argument is unavailing.  As an initial matter, calling something "a prominent banner" does not make it so, and this characterization is dubious given that the notice is aesthetically identical to the rest of the sign-up page.  More problematically for Defendant, it treats all four sign-up buttons as one entity.  The case law makes clear that the visual prong of the notice test must reflect the reasonable user's experience, and here, although a reasonable user is

---

[1] Plaintiff's arguments about visual notice refer only to the mobile version of the sign-up screen. *See* Opp. at 2 ("Defendant cannot show either notice of or assent to the Terms of Service based on *this screen*." (referencing the mobile version) (emphasis added)).  The Court understands Plaintiff to be asserting that he used the mobile version to create his account and therefore limits its discussion to that version.  The parties do not suggest that the analysis would differ between the two versions and the Court concludes that it would not.

United States District Court
Northern District of California

presented with four sign-up methods, he ultimately selects only one. *See, e.g., Chabolla,* 129 F.4th at 1157 (discussing how a reasonable user could sign up for the website by using *either* email or Facebook). Having made that selection, the other sign-up options necessarily become "superfluous." *Id.* Even if a user chose the sign-up option closest to the bottom of the webpage (the option to "Sign up with Google"), Defendant's contention that the notice is "positioned immediately below" is still incorrect. The language that is directly below the "Sign up with Google" button reads: "Already have an account? Sign in[.]" A reasonable user who is on Defendant's sign-up page to *sign up* for a Grok account, which is how Defendant contends Plaintiff agreed to its terms, would likely see that text and read no further because, by definition, it does not pertain to him. *See* Mot. at 5.

The notice-giving function of Defendant's chosen font size, color, and stylization is a closer call. Plaintiff argues that Defendant's choice of font weighs against reasonable notice because the hyperlink is white (instead of blue), "merely underlining the hyperlink" is insufficient, and the "'tiny gray' advisal text blends into the background." Opp. at 4 (quoting *Berman,* 30 F.4th at 856–57). In Defendant's view, its "slightly smaller text" with "bold hyperlinks" is far beyond "the 'tiny gray font' on the links in *Berman,*" and Plaintiff's objection to the color of the hyperlink ignores "the *maximum* visibility of white text against an all-black background." Reply at 2–3 (emphasis in original).

Plaintiff has the better argument. The contrast between the white hyperlink and the black background is notable, but it says nothing of the contrast between the hyperlink and the text immediately adjacent to it. *Cf. Sellers,* 73 Cal. App. 5th at 481 (deeming terms "inconspicuous" in part because the relevant hyperlink was underlined but "not set apart in any other way [from the adjacent text]"). Although Plaintiff is technically incorrect in saying that the hyperlinks are "merely underlined," Opp. at 4, as the links are both underlined *and* in a different color (white) than the adjacent text (light gray), the Court recognizes that the difference between light gray and white is a matter of degree and hardly one that maximizes visibility. Moreover, any distinction that this color variation provides is offset by the fact that other non-clickable text such as the "Create your account" heading is also in white. *Cf. Patrick v. Running Warehouse, LLC*, 93 F.4th

United States District Court
Northern District of California

468, 477 (9th Cir. 2024) (finding reasonable notice in part because the relevant hyperlink was in the "same color as other clickable links on the page, suggesting clearly that it is a hyperlink"). In this respect, Defendant's choice to adopt the "modern user interface norm" of designing its page almost exclusively in black and white undercuts its argument. *See* Reply at 3. This is especially true given that the single colorful feature—the multi-colored Google logo on the "Sign up with Google" button—is near the center of the screen, likely drawing a reasonable user's attention more than the monochromatic notice text at the bottom of the page does.

Defendant invokes *Keebaugh* and *Massel,* among other authorities, for the contention that colorful hyperlinks are not required for a notice to be reasonably conspicuous. The Court agrees that those cases support that proposition insofar as the text at issue was either black or white, but both are distinguishable. In *Keebaugh,* the white hyperlink had a white box around it that was roughly the same size as the only "action item" on the screen—the "Play" button on the mobile app. 100 F.4th at 1010–11, 1021. *Massel* is a closer analogy, but there, unlike here, the entire sentence was bolded and positioned above the "Continue" button, "in the natural flow of [the user's] actions." *Massel,* 2025 WL 2452371, at *1 (internal quotation marks omitted) (quoting *Chabolla,* 129 F.4th 1157).

Although the transactional context suggests that Plaintiff should have expected to be bound by contractual terms, the Court finds that the sign-up screen notice is not reasonably conspicuous because of "the notice's distance from relevant action items, its placement outside of the user's natural flow, and its font—notably timid in both size and color." *Chabolla,* 129 F.4th at 1157. Defendant "chose to use a textual notice attached to a hyperlink as opposed to a pure clickwrap or scrollwrap form" and then chose to display that notice in muted font away from the sign-up buttons. *Sellers*, 73 Cal. App. 5th at 482. "By doing so, [Defendant] ran the risk of a court concluding, as we do here, that the notice was not sufficiently conspicuous." *Id.*

Because the lack of reasonably conspicuous notice necessarily means that a user cannot unambiguously manifest his assent to those terms, the Court need not address the Parties' arguments or on that factor. *See Chabolla,* 129 F.4th at 1158 ("Given that screen 1 fails to provide reasonably conspicuous notice of the Terms of Use, any action the user takes on the page cannot

United States District Court
Northern District of California

unambiguously manifest her assent to those terms."). As such, the Court does not find *Wood v. MyPillow, Inc.*, which Plaintiff included in his statement of recent decision, ECF No. 25, persuasive here because that case turned on the issue of unambiguous assent. *See* No. 26-cv-00110-HSG, 2026 WL 1763858, at *6 (N.D. Cal. June 18, 2026). And, because the lack of reasonably conspicuous notice is dispositive, the Court concludes that Plaintiff did not agree to be bound to the 2025 forum selection clause by signing up for a Grok account. *See, e.g., Edwards v. MUBI, Inc.*, 773 F. Supp. 3d 868, 883 (N.D. Cal. 2025).

### b. The Chat Screen

The Court next evaluates whether Plaintiff agreed to both the 2025 Terms and the 2026 Terms by entering queries on the Grok chat screen "throughout 2025 and 2026," as Defendant contends that he did. Mot. at 1. Plaintiff disagrees and argues that the chat screen is not reasonably conspicuous because the hyperlink is "buried at the bottom of the page," is "smaller than the rest of the typeface found on the chat page," and is "signified only by a change of color." Opp. at 7. (internal quotation marks omitted) (first quoting *Nguyen,* 763 F.3d at 1177*;* then quoting *Price v. Carnival Corp*., 712 F. Supp. 3d 1347, 1359 (S.D. Cal. 2024); then citing *Colgate v. JUUL Labs, Inc*., 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019)). In Plaintiff's view, Defendant's "insufficient" design choices give the Court "no reason . . . to depart from [courts'] traditional reluctance" to enforce "prototypical browsewrap agreements." *Id.* at 6–7 (citing *Berman*, 30 F.4th at 856).

On reply, Defendant proffers essentially the same arguments that it does for the sign-up screen. Defendant contends that the chat screen notice is "in bold, white, high-contrast text directly beneath the query box that Plaintiff admits using repeatedly." Reply at 2. "[N]o scrolling is required, and the notice is the only other text on the uncluttered screen." *Id.*

Although the Court disagrees with Plaintiff's characterization of the chat screen as browsewrap, as discussed *supra* § III.B.2, the Court nonetheless finds that the chat screen fails the visual analysis test. Contrary to Defendant's argument, it is patently untrue that the notice is "directly beneath the query box." *See* Reply at 2. Nothing is directly beneath the query box except a lot of empty space. Moreover, the query box is the only action item on the chat page, and

14

as such a user's "most obvious and natural next step" is to input text into that box. *Chabolla,* 129 F.4th at 1157. Because the query box is on the top third of the page and no additional graphics or text give the user any reason to look beyond it, the notice at the bottom of the website is "buried" beyond "the periphery" of where a user would be looking. *See id.;* Opp. at 7. In other words, "[t]he notice seems to fade into the irrelevancy of other aspects of the page," here, the black background. *Chabolla,* 129 F.4th at 1157.

The other issue with Defendant's position is that, unlike on the sign-up screen, the hyperlinked terms on the chat screen are not underlined. The only factor distinguishing the hyperlinked text and the adjacent text is the font color, and, as the Court noted *supra* § III.C.2.a, white and light gray are not "contrasting font colors." *See Berman,* 30 F.4th at 857 (discussing "the use of a contrasting font color (typically blue)" as one element denoting the existence of a hyperlink. If a "web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text," it follows that a web designer must also do more than simply lightening the font color from faint gray to white. *See id.* (quoting *Sellers,* 73 Cal. App. 5th at 481). "Consumers cannot be required to hover their mouse over otherwise plain-looking text" to "ferret out hyperlinks." *Id.* (quoting *Nguyen*, 763 F.3d at 1179). Because this is exactly what a user looking at Defendant's chat screen would need to do, the Court also finds that the chat screen advisal is not reasonably conspicuous, even in the context of the transaction at play here.

Defendant cites a number of cases in which identical or similar forum selection clauses were enforced, urging this Court to follow suit. *See Doe v. X Corp.*, No. 25-cv-07597-TLT, 2025 WL 3500543, at *6 (N.D. Cal. Nov. 6, 2025); *Eliza Labs, Inc. v. X Corp.*, No. 25-cv-07243-AMO, 2025 WL 3003766, at *7 (N.D. Cal. Oct. 27, 2025); *St. Clair v. X.AI Holdings Corp.*, No. 1:26-cv-00386-ALC, 2026 WL 1803744, at *1 (S.D.N.Y. June 23, 2026); *Taddeo-Waite v. X Corp.*, No. 3:25-cv-00874 (VDO), 2025 WL 3237422, at *4 (D. Conn. Nov. 20, 2025); *Williams v. X Corp.*, No. 1:25-00058-JB-MU, 2025 WL 2801626, at *5 (S.D. Ala. Oct. 1, 2025). Defendant's reliance on those cases is misplaced because they are factually and legally distinguishable from the present one in critical respects. For example, the plaintiffs in both *Eliza Labs* and *St. Clair* acknowledged

15

that they had seen the terms. 2025 WL 3003766, at *6; 2026 WL 1803744, at *3. In *Taddeo-Waite*, the hyperlinked terms were in blue and more prominently displayed on the webpage. 2025 WL 3237422, at *3 (noting that the blue hyperlinked terms were between the relevant action buttons). *Doe* shares those features as well as a "banner [] displayed during a month-long period of notice" and "media coverage surrounding [the] updated terms." 2025 WL 3500543, at *6. *Williams* did not address the issue of contract formation at all. 2025 WL 2801626.

### D. Conclusion

The Court thus finds that, under California law, Plaintiff lacked reasonably conspicuous notice of Defendant's forum selection clauses and therefore could not have unambiguously assented to them. *See Chabolla,* 129 F.4th at 1158 ("Given that screen 1 fails to provide reasonably conspicuous notice of the Terms of Use, any action the user takes on the page cannot unambiguously manifest her assent to those terms."). As such, the Court concludes that Defendant's transfer motion must be denied.

### IV.   ORDER

    (1)    Defendant's motion to transfer is DENIED; and

    (2)    This order terminates ECF No. 21.

Dated:  August 13, 2026

_____
BETH LABSON FREEMAN
United States District Judge

16